AGAWAM CANAL COMPANY AND ANOTHER *vs.* ARNOLD EDWARDS
AND OTHERS.

ARNOLD EDWARDS *vs.* THERON ROCKWELL AND OTHERS.

The petitioners were mill owners on Westfield River. Prior to 1826 Strap
Brook was a tributary of that river. In that year the brook was lawfully
taken by the Farmington Canal Company under powers conferred by its char-
ter and by a new channel transferred from its old bed into the canal and through
the canal into Farmington River. The canal company in 1848 abandoned its
canal and practically ceased to exist, but the brook thus diverted had ever
since continued to flow toward Farmington River. The petitioners purchased
their mill sites and established their mills after the brook had thus been diverted
and while the canal company was in existence and operation.—The question
as to their right to a restoration of the brook to its original channel as against
riparian owners upon the new channel, discussed but not absolutely decided.

A riparian proprietor has an interest in a stream which runs over his land. It
is not however a title to the water, but only a right to use it while passing. A
diversion of the water is not an injury to any property in the water before it
enters upon his land, but is an injury only to his right to receive and enjoy it
upon his land. *Sed quære.*

If Strap Brook had been a tributary of Westfield River at the time the petition-
ers took their title, a subsequent or continued unlawful diversion of it would
have been an injury to an incident right which would have passed by the
grant. But as the brook was not then a tributary of that river no present
right to the flow of its water then existed or passed as an incident to the grant,
unless it was a contingent reversionary right to have the stream restored to its
original channel after the canal should be discontinued. *Sed quære.*

The charter of the canal company authorized it to take and use all necessary
streams and provided for a mode of compensation, and further provided that
"the lands, waters and streams thus taken shall be owned and possessed by said
corporation for the use of said canal forever." Held that, as the brook was
taken adversely, if it was unlawfully taken the rights of the petitioners or their
grantors were lost at the end of fifteen years; but if lawfully taken and the
right of ownership and possession on the part of the canal company ceased
upon the abandonment and discontinuance of the canal, there was no contin-
gent reversionary right dependent upon such abandonment and discontinuance
in the grantors of the petitioners. *Sed quære.*

The rights of the grantors of the petitioners as riparian proprietors on Westfield
River in the flow of Strap Brook into the river, was a mere right to treat any
person unlawfully diverting it as a tort feasor to their riparian rights. A re-
versionary, incidental, transferable interest implies a property in the thing
taken or granted at the time it is taken or granted, and cannot be predicated
of a mere right to treat a diversion of the flow of water as a nuisance. *Sed
quære.*

It was not the duty of the canal company upon abandoning their canal to restore
the streams taken by them or to replace in its original condition everything
which had been changed by them in the construction of the canal.

Agawam Canal Co. *v.* Edwards.          Edwards *v.* Rockwell.

Where there was no evidence either way as to whether the damages originally assessed for the taking of the stream by the canal company had been paid, and the persons entitled to the same were not parties to the suit, and thirty-four years had elapsed, it was held that it would be presumed that payment had been made.

Where two persons, each of whom owned lands on both sides of the canal, made an exchange by which one party conveyed to the other all his land east of the canal, and the latter conveyed to the former all his land west of the canal, the land being bounded " on said canal," it was held that the center of the canal was to be taken as the dividing line between them.

The right of a riparian proprietor to enter upon the land of another to abate the nuisance of diversion, exists only against the wrong doer, and he has no right to enter upon or flow the land of innocent parties for the purpose of regaining the use of the diverted water.

Where two causes in which the parties are reversed are by agreement argued together, and the parties have not agreed which should go forward in argument, and there is nothing in the nature of the causes to give either party precedence, the matter will be determined with reference to the cause standing first on the docket, the other being regarded as taken up in subordination to it.

BILLS IN EQUITY ; brought to the Superior Court in Hartford county. The first case is a petition of the Agawam Canal Company, a corporation of the state of Massachusetts, and of Theron Rockwell of Southwick in that state, against Arnold Edwards, Edwin P. Stevens, Luther Griffin, Erastus Owen, and Hector Case, of Suffield and Granby in the state of Connecticut, praying that the respondents be enjoined from diverting the water of Southwick Ponds, and of the streams flowing into the same, from the channels by which they flowed to the mills of the petitioners. The second case is a petition of Arnold Edwards, one of the respondents in the first case, against Theron Rockwell, one of the petitioners in the first case, Edwin Gilbert and John Boyle, praying that the respondents be enjoined from making a dam across a brook known as Strap Brook, by means of which the land of the petitioner was overflowed. The two cases involve the same general facts and were referred together to a committee and argued together before this court. To save the constant repetition of names the term petitioners will be applied exclusively to the petitioners in the first case, and the term respondents to the respondents in the first case, without reference to their change of place in the second case. The committee to whom the cases were referred reported the following facts :—

The Agawam Canal Company is a corporation established by authority of the state of Massachusetts, and doing business in the town of West Springfield, in Hampden county in that state, and is, and from before the bringing of the petition has been, the proprietor and occupant of certain valuable factories in that town, and on Westfield river, and propelled by and wholly dependent on the water power thereof, and of great value to the company. The other petitioner, Theron Rockwell, is the owner of a mill in the town of Southwick, Massachusetts, on Southwick brook, hereinafter mentioned, and wholly dependent for its propelling power upon the waters of that brook.

Arnold Edwards, one of the respondents, on the 1st day of April, 1865, was, and ever since has been, seized in fee and possessed of a tract of land situate in the town of Suffield, in the state of Connecticut, containing about one hundred acres, bounded north on the state line, west on the New Haven and Northampton Railroad, east on land of heirs of Samuel Griffin and others, and south on the Suffield turnpike.

Adjoining the town of Suffield, and near the dividing line between the states of Massachusetts and Connecticut, there are, and have ever been, two large bodies of water, fed partly by springs and partly by brooks, which bodies of water, distinguished as north and south ponds, are connected with each other, and are known as the Southwick Ponds.

The natural outlet of these ponds is, and has ever been, within the state of Massachusetts, and into and through Southwick Brook, and thence into Westfield River, and a large amount of water from the ponds now flows, and until the construction of the Farmington canal, as hereinafter stated, ever flowed, and but for the canal would have uninterruptedly flowed, into and through said brook into said river, materially increasing the volume of water in both, and the water power thereof, and the value of the mill sites thereon, which are, and are owned and occupied, as follows: The first site is owned and occupied by Edwin Gilbert and John Boyle, for a saw-mill and grist-mill, and is on the Southwick brook about two miles below the outlet of the pond. The

second is just below the first and on said brook, and is the mill of the petitioner, Rockwell, and used as a powder mill. The third is the site of the Agawam Canal Company mill, on Westfield River, below the mouth of Southwick Brook, and occupied by the company with extensive cotton mills, and by the Agawam and Southwick Paper Companies, with extensive paper mills, and all requiring abundant water power. There is a fourth site also on the river and below the Agawam Company's site, occupied by a large grist and flouring mill.

The site occupied by the Agawam Canal, the Agawam Paper, and the Southwick Paper Companies, was first taken up and used as a mill-site in 1836. This was done by the Agawam Canal Company, and while the Farmington canal was in operation, and the water in said ponds all withheld from Southwick Brook and turned south into said canal as hereinafter stated. The three other sites were used and occupied for mill purposes before the construction of the Farmington canal. The damage done to the Gilbert and Boyle and the Rockwell mill-sites by withholding and diverting from said brook the waters of said ponds by said canal, was duly and regularly appraised, assessed to the owners of said sites against the canal company and under its charter in the year 1836, but that the same was paid was not admitted by the petitioners, and it is not found by the committee, there being no evidence offered on that subject except the assessments only. The mills on the Gilbert and Boyle site were swept away in a freshet about the time the canal was dug, and were not rebuilt for several years, as the sites were and must be nearly worthless for mill purposes without the waters of the ponds.

The Rockwell mill was before the canal, as now, a powder mill, and after the diversion of the waters by the canal was occasionally run, but the water of the ponds is essential to its use as a mill, and the privilege substantially worthless without it. With these waters flowing into Southwick Brook, as now, and as before the canal diverted them, the mill and privilege are valuable. Edwin Gilbert and Thaddeus Foot built the present saw mill at the Gilbert and Boyle privilege

in 1846, and Gilbert built the present grist mill there in 1860, after the canal was discontinued and abandoned, which was in December, 1848. The petitioner Rockwell bought into and became interested in his mill and mill-site in the spring of 1848, and a little before the canal was discontinued.

Strap Brook was originally, and until diverted by the canal company as hereinafter stated, a principal tributary of said ponds, flowing in a crooked but generally northerly direction and emptying into said ponds, materially increasing the waters therein, and so in Southwick Brook and Westfield River, and the diversion of the waters of Strap Brook from those ponds, and so from Southwick Brook and Westfield River, has ever been, and must be, a material damage to the mill privileges upon the Southwick Brook and said river, and to the value of the same.

In the year 1822 the General Assembly of Connecticut incorporated " The President, Directors and Company of the Farmington Canal," with power to take all necessary lands and streams and to construct a canal through this part of the state, and with the usual powers of such corporations. The canal company was duly organized, and constructed their canal under their charter, and in the course of this construction entered upon certain lands in the town of Suffield belonging to Verannus Stevens, and certain lands lying next north of the Stevens land and near the state line, and on both sides of the Suffield turnpike, belonging to Jonathan Edwards, the father of the respondent Edwards, and in the course of the years 1825 and 1826 took possession of part of the same by their canal, excavating the same through these lands. The company at the same time took possession under their charter and excavated their canal through some land south of the respondent Edwards's land, and claimed in the answer to the petition of the latter as standing now in the name of Theron Rockwell. This land was then the property of the said Jonathan Edwards. The canal company took and appropriated these lands by and for their canal in virtue of a written agreement entered into with them by said Stevens and Edwards

and others, with reference to their respective lands, and with no other title. The following is the agreement:

" We the subscribers, living on or near the route of the Farmington canal, do hereby covenant and agree with the President, Directors and Company of the Farmington Canal, that in case said canal shall, by the commissioners appointed for the location of the same, be laid on or across any land owned by us, in consideration of the benefits to be derived from said canal we will give in and release to them all our right and title to all such land as may be deemed necessary, and may be taken for said canal, to be used by the said president, directors and company, for the purpose of making and constructing said canal, to be their property for the use aforesaid so long as said canal shall continue; and we do hereby agree that we will at their request and expense make, execute and deliver to the President, Directors and Company of the Farmington Canal, all such proper deeds as may be necessary in law to convey to them all our right and title to the land which may be thus taken for the purpose aforesaid, reserving however to ourselves the wood and timber on the same, giving said company the right of taking down said wood and timber in such manner as they may think proper. Witness our hands this 28th day of June, A. D. 1825.

Verannus Stevens, Isaac Griffin,     Thomas Hawley,
Jonathan Edwards, Harvey Holworth, Zophar Griffin,
Oliver Griffin,     Charles Holworth, Oliver Owen,
Samuel Griffin,     Pliny Hillyer,     Riley Dibble,
Theodore Hillyer, Joel Holcomb,     Alexander Miller, Jr.,
Isaac Phelps,     Alexander Miller, Daniel B. Holworth,
            Daniel Holworth, Jr."

"I will give my land of suitable width for the canal, they building suitable bridges to get to my land.

Daniel Hayes."

The canal company went forward and took said Jonathan Edwards's land, and land hereinafter mentioned of Verannus Stevens, under this agreement, and without more.

In excavating their canal through the first piece of land above mentioned, near the land of the respondent Arnold

Edwards, the company came upon Strap Brook, and diverted its waters from their old channel directly into their canal, the water running south therein at a distance of a mile or more from the natural entrance of the same into the ponds, and at a point south of the state line.

In connection with another canal company, known as the Hampshire & Hampden Canal Company, incorporated by the state of Massachusetts, and connecting with the Farmington canal, the canal was constructed and continued north from the state line, into and through said ponds, to the town of Northampton in Massachusetts. Said companies built a dam at the outlet of the ponds into Southwick Brook, for the purpose of keeping the waters in the ponds at a certain height for the use and benefit of the canal. They also constructed a guard lock across their canal south of the ponds, and north of but near the state line, to keep the waters in the ponds at a somewhat higher level than the water in the canal south of said locks, where it passes through said Edwards's land, and as a reservoir to feed their canal to the south. The outlet into Southwick Brook was stopped, as above, in 1830, and thereafter the waters of the ponds were wholly diverted and flowed south in the canal, until, in the spring of 1848, the petitioner Rockwell took out the canal dam at the outlet of the ponds into Southwick Brook, but whether so as entirely to clear the channel as it was before the canal dam was put in did not appear. There is now an artificial obstruction to the natural channel at this place, in a beam across the stream, the origin of which was not accounted for, although it does not seem to have been put in by the canal company when making their dam. By removing this outlet dam, Rockwell drew the waters of the ponds, in part, back into their old channel into Southwick Brook and Westfield River.

Strap brook, when the canal was built, ran through the respondent Edwards's land, north of the Suffield turnpike, in its course to the ponds, and when excavating the canal through these lands in 1826 the canal company, at a point on said Edwards's land, towards the north part thereof, though south of the guard lock, and of the state line, diverted the brook

into this canal, to feed the same, and the waters of the brook henceforth flowed south in the canal, with slight interruptions, to be hereinafter noted, until stopped, in 1861, by a dam in the canal under the railroad bridge, as hereinafter stated; and when that was removed, by the obstruction or dam placed in the canal by the petitioners in 1865, as hereinafter stated.

Before the building of the canal there were on said Edwards's land, south of the Suffield turnpike, and south of the place where the surface water ceased to run north and began to run south, and a little westerly of the land taken for the canal, one or two springs of water, from which water flowed into the head of a small pond, also west of the canal, two-thirds of which pond were north of the dam put by the petitioners in the canal in 1865, and the lower and southern third lay south of the dam. This pond was formed in part from these springs, and in part by a water-shed from Manetic mountain, at whose eastern base it lay. The water flowed from the lower end of this pond in a southerly direction towards Manetic Brook, and more or less of it found its way into that brook, and so into Salmon Brook and Farmington River. The evidence did not satisfy the committee that this flow was without interruption, depending on the greater or less dryness of the seasons; and much of the time it must have been small.

The canal company, when digging their canal at this point, buried these springs completely, and filled up the larger part of this pond with the materials taken out of the canal. A part of the pond, however, still exists, both above and below the dam erected in 1865. Water has appeared in the west bank of the canal, and in springs on and at the foot of the bank, since the original springs and the pond were buried and filled; which water flows south in the canal and is dammed by the dam erected in 1865; but the committee does not know, and does not find, that it is water from the original springs or from the pond.

At a point southerly of the dam erected in 1865, the canal company, early in the use of their canal, made a waste weir whereby the surplus waters from the canal, including those of

Strap Brook and the Southwick Ponds, were emptied into Manetic brook, and so passed to the mill-sites of two of the respondents, Erastus Owen and Hector Case, and thence into Salmon Brook and Farmington River; and said waters have ever since continued so to run until and except as interrupted by the various dams and obstructions placed in the canal, as hereinafter mentioned.

It was agreed by the parties, and is found by the committee, that the survey, laying out, location, and use of their canal, by the canal companies, were legal, and that their diversion and appropriation of the waters of the ponds and of Strap Brook, and of the springs and little pond, so far as taken, were legal so far as the same were authorized by their charter; only, as before stated, the petitioners do not admit, and the committee does not find, that the damages were paid which were assessed as aforesaid to the owners of the Gilbert and Boyle and the Theron Rockwell mill-sites.

Besides the original charter of the Farmington Canal Company, the committee, by agreement of the parties, finds as part of the facts of the case, the resolve of the General Assembly of Connecticut, incorporating the "New Haven and Northampton Company," (1 Private Acts, 308); also the incorporation of said company by the state of Massachusetts, and the conveyances to said company in accordance with its chartered privileges, by the Farmington Canal Company and the Hampshire & Hampden Canal Company, of all such franchises, and privileges belonging to the last named companies as the various acts of Connecticut and Massachusetts respecting the New Haven & Northampton Company authorized to be made, and so far as the same could legally be made under said charter and acts; and also the acceptance and taking possession by said New Haven & Northampton Company of said franchises and privileges; also the various acts of the state of Connecticut relating to said New Haven & Northampton Company and its construction and operation of a railroad under the power granted it, from New Haven to a point in the town of Granby, Connecticut; also the incorporation by the state of Connecticut of the Farmington Valley Railroad under its

charter in said private acts, its organization under the same, and that its road is now built and in actual use from some point at or near the north terminus of the New Haven & Northampton Company's road in Granby to the north line of Connecticut, at a point within one hundred rods west of the point where the old canal crosses the state line into Massachusetts; also that the Hampden Railroad Company is a corporation duly incorporated under its charter granted in the state of Massachusetts.

Before the construction of the Farmington Valley railroad there was and ever had been a natural pond of several acres extent, but varying in size with the seasons, situated in the town of Suffield, about one and a half miles east of the old canal. This pond, called sometimes Duck Pond, sometimes Seven-Acre Pond, seems to have been made by an accumulation of surface water from higher grounds around it, and what ran in above a certain level ran off in a southerly direction, and often in considerable quantity, and found its way to a greater or less extent into Manetic Brook, east of the canal. Manetic Brook when the railroad was built crossed and still crosses the canal a few rods south of the state line, and south of the dams of the petitioners erected in 1854 and 1865, and its waters, after uniting with the waters flowing through and from the canal as aforesaid, flowed to the mill-sites of the respondents Case and Owen, and thence into Salmon Brook and Farmington River.

The Farmington Valley Railroad Company when building their road made a deep excavation near to and northerly from Duck Pond in such manner as almost entirely to drain the same, and through this excavation the waters which before formed this pond are now mostly carried northerly into Strap Brook, and thence through the same and the land of the respondent Edwards, into the canal, and, until and except as the waters were dammed in the canal by the railroad company and the petitioners, through the canal to Manetic Brook, and so to the mills of the respondents, Owen and Case, and to Salmon Brook and Farmington River.

Subsequently, and before 1865, the Farmington Valley

Railroad Company, by sale or lease, transferred the use, possession, and occupation of their road to the New Haven & Northampton Company, who now possess, control, and operate the same. The canal when first built, and ever after, crossed Manetic Brook at the same place where the waters now join.

The respondent Hector Case owns the first mill seat on Manetic Brook, below where its waters are joined by those in the canal. His is a saw and shingle-mill, and used also in the manufacture of powder kegs. He bought it of Zophar, Henry, and Horatio Griffin, in the year 1859, and when the waters of Southwick Ponds and the waters of Strap Brook and other waters in the canal were flowing freely in the canal without obstruction south to their junction with Manetic Brook, and through said brook to this mill, and so to the mills and streams below. This mill was built before the canal was made, and was then owned by the said Zophar Griffin, who was one (as was also the said Henry Griffin another,) signer of the agreement with the canal company of the date of June 28th, 1825, hereinbefore given, and a part of his land was taken by the company for their canal under that agreement. The respondents proved by parol, subject to objection by the petitioners, that when the said Zophar signed the agreement, it was agreed with him by those then acting in obtaining the agreement for the canal company, that as one benefit for signing the same, and giving his land, he was to have for his mill the waste water from the canal in time of navigation, and when the canal was not navigable in winter he was to have all the water, instead of its being let off into the locks below; and the mill, while the canal was operated, had the waste water during the season of navigation, and in general all the waters in the canal below the guard-locks at other times; and since the canal was abandoned in 1848, until and as obstructed by the dam in the canal put in by the railroad company and the petitioners, the waters of Strap Brook, and all the waters in the canal north to Southwick Ponds, and the waters from said ponds, have flowed freely through and from the canal into Manetic Brook and to this mill, and

thence to the mills below upon said brook, and Salmon Brook, and Farmington River, and the said Case, and Erastus Owen, another respondent, have claimed the same as their right.

The said Erastus Owen owns a saw and shingle-mill on said Manetic Brook, below Case's mill.   This mill-site was taken up and built on first between 1831 and 1836, and while the canal was in full operation, and had all the advantages coming to the same from the waters in the canal then coming into Manetic Brook.   The present owner, Owen, first became interested there in 1852, and while there were no obstructions to the free passage of the waters in the canal and thence into the brook.   The waters of Manetic Brook alone are entirely insufficient by themselves to furnish steady power to either Case's or Owen's mill, and any diminution of the water in the brook increases the difficulty, such as the diversion of Duck Pond, and of the water coming up in springs out of the bed on the west bank of the canal north of the dam erected in 1865, although the committee finds that this alone would not materially affect the use and value of the Owen and Case mill-sites.

The waters of Strap Brook, however, make a very material and valuable addition to the water power of the mills and mill-sites on Southwick Brook and Westfield River, if going there, and to these mills of Owen and Case, and thence below them in Salmon Brook and Farmington River, if going there; and the like is true respecting the waters of Southwick Pond. Without obstructions put in the canal the waters of said ponds largely, and of Strap Brook entirely, have flowed through the canal into Manetic Brook, to the great advantage of·the Owen and Case mills and those below them, and the depriva- tion of this water is a very serious disadvantage, and, if unlaw- ful, injury to both these mills ;   and on the other hand, to be deprived of the flow of the waters of either Strap Brook or said Southwick Ponds must be a serious loss to the mill owners on Southwick Brook and Westfield River, to the for- mer making their privileges nearly worthless, and, if unlawful, a great injury.

There are below said Owen and Case mills, on Salmon

Brook and Farmington River, other mills and manufacturing establishments, and some of them extensive, all of which have depended and do depend on the waters flowing in Manetic Brook, and which have been and will be materially affected for good by the large supply, and for evil by the less supply afforded thereby.

Just south of the state line, and bordering on the canal, and through which Strap Brook now runs, (since the canal was made running into the canal, and before the canal was built always running to Southwick Ponds,) there is a tract of land of about a hundred acres now belonging to the respondent, Arnold Edwards, formerly part of the land before mentioned of Jonathan Edwards, the father of Arnold, and devised by him to the latter. There are from eight to twelve acres of this land which before the canal was made were somewhat wet but could be used as pasture. The effect of the diversion of Strap Brook into the canal was to drain and so improve this part of the land, and make it more valuable, and capable of cultivation, and the same was cultivated accordingly, and produced crops of corn and other crops, and was valuable as mowing, and so continued from 1826 until the railroad dam in 1861 was put into the canal, as hereafter stated.

· The canal was discontinued and abandoned for use as such in December, 1848, and has long ago become unnavigable; the guard locks were removed, and the canal left entirely open from Southwick Ponds to below the crossing of Manetic brook; and the waters of Strap Brook, and to a greater or less extent of Southwick Ponds, continued to flow south through the canal without interruption, passing into Manetic brook to the mills of Case and Owen, and thence to Salmon Brook and Farmington River, until in October and November, 1853, while the Farmington Valley Railroad Company was building its road; and to facilitate this the company, with the consent of the respondent Arnold Edwards, whose land would thus be flowed, filled in the canal at the point where the railroad crosses the same a little south of the Suffield turnpike and of the land of said Edwards. This obstruction

for the time prevented the waters of Strap Brook and of said ponds from flowing south, as they had been flowing since the canal had first diverted them, and restored them to their old flow northerly towards and to a certain extent into Southwick Brook and Westfield River. The obstruction seems to have been retained a few days after the occasion for it on the part of the railroad company ceased, and it was somewhat strengthened and heightened by the petitioner Rockwell and the mill owners on Southwick Brook and Westfield Biver, but on complaint made to the railroad company the company removed it, and the waters resumed their flow south as before. This obstruction continued in all about six weeks.

The next year, 1854, the Agawam Canal Company bought a piece of land a half mile or more south of the railroad crossing, and including the bed of the canal, and in concert with Rockwell and others of those concerned in the mills on Southwick Brook and Westfield River, filled up the bed of the canal at that place, and so again dammed the waters of Strap Brook and of said ponds from flowing south. This obstruction, however, was of very brief continuance ; it was hardly put in before it was removed, although by whom was not in evidence, and the waters continued flowing south as before, until in 1861 the New Haven & Northampton Company, and Rockwell and his associates, put in a solid embankment at the railroad crossing, where in 1853 the railroad company had put in their temporary dam. This embankment dammed again the waters from flowing south and sent them north, and restored those of Strap Brook and the Southwick Ponds to a certain extent into Southwick Brook and Westfield River, and matters so continued, notwithstanding efforts on the part of the respondents to have the dam removed, until July, 1865.

There was, however, in the year 1863, a petition brought to the General Assembly of the state of Connecticut for some action to bring about the removal of this dam, and in reference to this or something like it expected, the legislature of Massachusetts, on the 29th of April, 1863, passed a resolve authorizing the attorney general of that state "to appear before the General Assembly of Connecticut to oppose any

action of said Assembly having for its object the diversion of the waters of Southwick ponds and their tributaries from their natural outlet in Massachusetts into the Farmington River, in the state of Connecticut, and to protect the interests of Massachusetts and its inhabitants in said waters."

What was done with the petition to the General Assembly of Connecticut did not definitely appear, but the committee understood that nothing came of it, and so finds ; but in July, 1865, the General Assembly of Connecticut passed the resolve "relating to the Farmington Valley Railroad Company and the New Haven & Northampton Company," which appears in the printed private acts of that year, on pages 168, 169. Whether any or what notice was given to the state of Massachusetts or to any of the respondents did not appear ; but one or more of the respondents, and also Mr. Gillette, the attorney of the state of Massachusetts for Hampden county, although it was not shown that he was there officially, were present at some stage of the proceedings before the legislative committee having this matter referred to them.   After the passage of this resolve, and during the month of July, 1868, the New Haven & Northampton Company removed the embankment and obstruction from the canal, and left the waters to flow south again as before ; but before the obstruction was so far removed as to let the water pass, the petitioners Rockwell and the Agawam Canal Company, and others interested with them in said Southwick Brook and Westfield River mills, again interposed.

On the 30th of June, 1865, Rockwell took a deed from Emeline H. Hall, and her husband Daniel E. Hall, conveying a piece of land in Suffield, a short distance south of the railroad dam, but north and above the place of the dam of 1854, said land being bounded in the deed as follows :   " A certain piece of land· lying in Suffield near the junction of the old Farmington canal and the New Haven & Northampton railroad, south of the highway leading from North Granby to Suffield, on the east side of the Manetic Mountain, bounded on the west by the railroad company's land, extending south so far as said company's land to a pile of stones ; easterly

on land formerly owned by Verannus Stevens; north on land of Theron Rockwell and the railroad company, each in part; south on our own land; containing four acres more or less." The interest of said Daniel in this land was only as husband in the right of his wife, and her interest conveyed to said Rockwell was as follows:—Jonathan Edwards, the father of the respondent Edwards, owned the land at this point which lay next south of the Suffield turnpike, and where and through which the canal was excavated, in one continuous tract with his other land north of the turnpike, which latter is the same mentioned as above as now owned by the respondent Arnold Edwards, and through which also the canal company laid and excavated their canal, and all was so taken and appropriated by said company in virtue of and under the agreement hereinbefore set forth. When Jonathan Edwards died he devised all this land north and south of the turnpike to the respondent Arnold Edwards, but the latter shortly after conveyed to his brother Townsend all that lay south of the turnpike. A small part of these latter premises lay east of the canal, and the much larger part west. The premises next south were those of Verannus Stevens, above mentioned, and through which, under the agreement, the canal company had also laid and excavated their canal in 1835. Townsend, after the conveyance to him, and while proprietor of his land, and Stevens, for their mutual convenience, exchanged lands, Townsend conveying all his land east of the canal to Stevens, and the latter conveying all his west of the canal to Townsend. The deed of Townsend to Stevens is dated March 17th, 1835, and bounds the lot conveyed " west on said canal." This was when the canal was in full operation. The canal thereafter served as a boundary and fence between the lands of Townsend on the west, and those of Stevens on the east, and matters so continued until the canal was abandoned for use as such in 1848. The water still continued to run therein, but was much lower than before, so as not to serve as a fence against cattle, and in 1851 Townsend and Stevens built a fence between their lands the whole length of their junction, Stevens the north half and Townsend

the south half, the north half being built on the east side of the canal at the water's edge, and the south half on the west side of the canal at the water's edge, and the north end of the south half and south end of the north half connected by timbers across the canal a short distance below the Rockwell dam of 1865. This was done under a parol agreement between Townsend and Stevens to that effect, and that the centre of the canal should be the dividing line between them. To this parol agreement, offered in evidence by the respondents, the petitioners objected as not evidence to vary their rights; but the respondents claimed it as showing that the fence was off from the true line, as they claimed the true line to be, the centre of the canal, *by agreement*, and that so an adverse possession was prevented. Townsend Edwards shortly after died, leaving four heirs, of whom the said Emeline H. Hall was one. The other three, her brothers and sister, conveyed to her by deed dated February 26th, 1856, their interest in said land of their father, otherwise than as its eastward limits are restricted by the description of the land conveyed, given in the deed, which description is as follows : " The following piece of land lying in Suffield west of the mountain, and bounded as follows, viz : west on the ledge of Manetic Mountain, north on the highway, east on the west bank of the Farmington canal, south on Aristarchus Griffin's land, and contains thirteen acres more or less."

Verannus Stevens conveyed to the Farmington Valley Railroad Company the land over which their road was built, east of and adjoining the canal where the road crosses the canal, by deed dated April 15th, 1853. The conveyance was in fee for the perpetual use of the land by the grantees as a railroad.

In November, 1864, by a deed recorded in February, 1865, Luther Griffin, one of the respondents, had become the owner of the land conveyed by Townsend to Stevens, and of the other land of Stevens adjoining, subject to an interest therein reserved for life to Edwin P. Stevens, a son of Verannus Stevens, and his wife. About the middle of July, 1865, and while the New Haven & Northampton Company were proceeding in the removal of the embankment of 1861, but before it was so removed that the water could pass, Rockwell and his

associates filled up the canal at the point where Rockwell had, on the 30th of June preceding, bought of Daniel and Emeline Hall, carrying their filling, however, completely across the canal from the west side beyond the center to the east side of the canal, and thereby made a dam which effectually prevented the water from passing south when the railroad dam was taken away, and caused, and has ever since caused, the waters in the canal, north thereof, including those of Strap Brook, and of Southwick Ponds, to go to a certain extent and largely into Southwick Brook and Westfield River. In making said dam Rockwell and his associates did not raise the level of the land above what it had been before the canal was excavated, and their purpose was only to prevent the waters of Strap Brook and Southwick Ponds from flowing south, and as far as they could make them pass off through Southwick Brook and Westfield River as they had done before the canal was made, for the use and benefit of the mills on these streams. Before the dam was sufficiently completed towards the east side of the canal to stop the water, Rockwell and his associates were notified by the respondents Luther Griffin and Edwin P. Stevens that they owned the land at that point on the east to the center of the canal, and were forbidden by them to proceed with the dam on their premises.

The course of Strap Brook prior to the construction of the canal while passing through said Edwards's land, and thence to Southwick Ponds through lands of other proprietors, was quite crooked, and on one part for quite a distance the committee finds its ancient bed has, in the course of cultivation, since the diversion into the canal, been dragged over and partially filled up.

The canal company, in the course of their construction and use of their canal, at one time carried a solid embankment across the outlet of Southwick Ponds (but some distance above where it enters Southwick Brook) as a tow-path, and about the time when Rockwell took away the canal dam at the outlet into Southwick Brook this embankment was broken through in two places, but not as low down as the natural bed of the ponds. When the Farmington Valley Railroad Company built

their road in 1853 and 1854, they built another solid embankment across the outlet west of that of the canal company, and nearer, but still above, the entrance of Southwick Brook, and to enable the water to pass towards and into that brook the railroad company constructed a culvert near the outlet in the south, but on what had before been dry land. The bed of this culvert was, and ever has been, considerably higher than the bed of the outlet, and the railroad embankment thus acts as a dam, and obviously obstructs the passage of the water in Southwick Ponds towards and into Southwick Brook.

By the erection of the railroad dam of 1861, and the one in 1865, now complained of by the respondents, the waters of Strap Brook, including any waters therein coming from Duck Pond, were and are turned back in the canal through the land of the respondent Edwards, and made to flow north, and the waters of Southwick Ponds, which had been flowing south in the canal, and any waters in the canal north, are also dammed back.

The effect of this dam on the land of the respondent Edwards hereinbefore stated to have been drained by the canal, is to raise the water of Strap Brook on the same to a higher point, and flow it more, and render it less valuable, than before the canal was made. From two to four acres on its banks which, before the canal was made, could be used as pasture, though not cultivated, and which, after the canal was excavated until the railroad dam of 1861 was drained by the canal, was cultivated, and but for this 1865 dam would, on the removal of that of 1861, have again been drained and been cultivable, is by this dam rendered wholly worthless even for pasture, and some six to eight acres more of the land is now injured by the water, and cannot be cultivated at all, and is poorer for pasture and of less value than it was before the canal was dug, and this damage will continue while the dam and flowing caused thereby continue. The petitioners requested the committee to find that the injury thus caused by the dam to said land is compensable to the owner in money, and the committee so finds. Other lands of other proprietors in the vicinity are similarly affected and injured, and the

other respondents, Owen and Case, and the mill owners below them on Salmon Brook and Farmington River, are deprived of the use of the waters so dammed from their mills.

Were the obstructions in the outlet of Southwick Ponds put in by the railroad and canal companies entirely removed so that the flow into Southwick Brook were as free as before the canal was built, the committee is of opinion, and finds, that the water would be as high, but not at an appreciably higher point, on the respondent Edwards's land, and the land of other proprietors, by reason of the dam now complained of, except that in the bed of the canal itself the waters of Strap Brook would flow out of their natural course, unless the bed of the canal and the place through which Strap Brook was diverted into the same were filled up, and the old channel re-opened where it is now filled.

The committee finds that the canal company while operating their canal had the canal itself as their object in the management thereof and of its waters, and any advantages accruing to the respondent Edwards and the mill owners on Manetic brook and below, were subordinate and incidental, and there was no proof that these were allowed as a right to any person concerned, other than the agreements before referred to.

The canal company, at times while operating their canal, and before they abandoned the same, put up temporary dams in the canal near the southerly line of the Arnold Edwards land, to lay up the water for a while, and this for the time served to flow the Arnold Edwards premises adjoining, and hold the water back from flowing south in the canal; but it was at such periods of the year as not to affect the substantial drainage of the land for cultivation and not to injure the same, and the water eventually flowed south in the canal and to the crossing of Manetic Brook, to pass by or into the same as at other times.

There was no evidence to show that either of the respondents had threatened to remove the dam erected in 1865, but the petitioners had reason when they brought their petition to expect that they, or some of them, would so remove it.

The Superior Court accepted the report of the committee and reserved both cases for the advice of this court.

When the cases came up for argument in this court a question was made as to which party should go forward, both being petitioners and both respondents. The court decided that the only rule they could adopt in such a case, in the absence of anything in the nature of the cases entitling either party to precedence, was to take the cases as they stand on the docket, the first one being reached and entitled to a hearing, with the ordinary right of the petitioners to go forward, and the other being by agreement of the parties taken up with it before its turn, and therefore in subordination to it, except so far as the parties should have agreed otherwise.

*T. C. Perkins* and *Chamberlin*, for the petitioners, Agawam Canal Company and Rockwell, cited *Buckingham* v. *Smith*, 10 Ohio, 288, 297 ; *Cooper* v. *Williams*, 5 id., 392 ; *Varick* v. *Smith*, 9 id., 547, 559 ; *Bishop* v. *Seeley*, 18 Conn., 393 ; *Seymour* v. *Page*, 33 id., 61 ; *Coe* v. *Winnipiseogee Lake Manufacturing Co.*, 37 N. Hamp., 254 ; *Richards* v. *Phœnix Iron Co.*, 7 Am. Law Reg., 356, 359, 361 ; Angell on Watercourses, §§ 466, 469, 470.

*Hyde* and *Maltbie*, for the respondents, Edwards and others, cited Angell on Watercourses, (Perkins ed.) §§ 166*e*, 166*f*, 166*g*; *Chase* v. *Sutton Manufacturing Co.*, 4 Cush., 152 ; *Dunklee* v. *Wilton R. R. Co.*, 4 Fost., 489, 506 ; *Warner* v. *Southworth*, 6 Conn., 471 ; *Bradford* v. *Cressey*, 45 Maine, 9, 13 ; *City of Boston* v. *Richardson*, 13 Allen, 146, 152, 154.

· BUTLER, J. These cases involve the same facts and principles and having been argued together will be so considered in this opinion.

It is apparent that the gist of the controversy relates to the diversion of Strap Brook. For aught that appears ·the petitioners, the Agawam Canal Company and Rockwell, could have closed the mouth of the canal at the pond at any time, and thereby secured the waters of the ponds ; but in so

doing they would practically have abandoned those of the brook. By their present dam they secure both. In effect then they ask the aid of the court to enable them to maintain their present dam in order to secure the waters of the brook. We think their bill must be dismissed and that the respondent Edwards is entitled to relief.

We are not satisfied that the Agawam Canal Company and Rockwell have any interest in the diverted waters of Strap Brook, or any legal and enforceable right to have them restored to their original flow.

Those petitioners are riparian mill-owners within the water shed of Westfield River—the Agawam Canal Company on the main stream, and Rockwell on one of its branches, known as Southwick Brook. Prior to 1826 Strap Brook was within that water-shed, and a tributary of Southwick Brook and Westfield River. In that year the stream was lawfully taken by the Farmington Canal Company pursuant to authority conferred upon them by the legislature of Connecticut in the exercise of their right of eminent domain, and by the construction of a new and deeper channel, transferred from its old bed, and the water shed of Westfield River, into and through their canal to Manetic Brook and the water shed of Farmington River. Such has since been its natural flow, and would now be if left to itself. The Agawam Company purchased their lands and constituted their mill-site in 1836, and Rockwell purchased his mill and site in 1848. At the time they severally purchased, the transfer of Strap Brook had been lawfully made, and it was not then a tributary of Westfield River, or within its water shed. What right then did they acquire in or to the flow of its waters by the purchase of their sites?

The principle contained in the maxim, " *Cujus est solum, ejus est usque ad coelum,*" gives to a riparian owner an interest in a stream which runs over his land. But it is not a title to the water; it is a usufruct merely; a right to use it while passing over the land. The same right pertains to the land of every other riparian proprietor on the same stream and its tributaries; and as each has a similar and equal usufruc-

tuary right, the common interest requires that the right should be exercised and enjoyed by each in such a reasonable manner as not to injure unnecessarily the right of any other owner, above or below. Each is therefore required by law to let the water flow on as it has been wont to flow, that all may receive and enjoy it on their land; and no one can divert or detain it, unreasonably, without doing an injury to the usufructuary right of others below him, in the nature of a nuisance, which may be abated, and for which an action on the case will lie. It is apparent that the right of a riparian owner thus to abate or sue is not founded on a title to the water or *any property* in it before it enters upon his land, but on the ground that an injury or tort, in the nature of a nuisance, has been done to his right to receive and enjoy upon his land the flowing and common element. He has no legal right therefore but that of reception and enjoyment of the natural flow of the water, as a land owner and on his land, that can be injured.

It is a well-settled rule that a grantee of land takes with it such incidents and appurtenances only as are annexed to or a part of it at the time of the grant. If Strap Brook had been within the water shed of Westfield River and a tributary of it at the time the petitioners took their respective grants, a subsequent or continued, but not previous, unlawful diversion of it would have been an injury to an incident right which would have passed by the grants, unless such diversion had continued adversely for fifteen years and the right was lost. But the brook was not then a tributary of that river or within its water shed, and no present right to the flow of its water then existed or passed as an incident to the granted lands, unless it was a contingent, reversionary right to have the flowage of the stream restored to its original water shed after the canal was discontinued. Could such a right exist as an incident to the lands under the circumstances and pass by the grants to the petitioners?

Strap Brook was diverted from the water shed of Westfield River into Farmington River by the canal company pursuant to authority given by the 5th section of their charter. That section authorized them, with the approbation and consent of

FEBRUARY TERM, 1870.        499

Agawam Canal Co. *v.* Edwards.        Edwards *v.* Rockwell.

a board of commissioners provided by the charter, among other things, " to enter upon and take possession of and use, all and singular, any lands, waters and streams necessary &c.," and further provided for an assessment of damages by the commissioners in case of disagreement with those interested, and closed with the following clause : " and the lands, waters and streams thus taken shall be owned and possessed by said corporation for the use of said canal forever." The brook was taken under that authority, and of course adversely, and if unlawfully taken the rights of the petitioners or their grantors were lost at the end of fifteen years. But if, as is conceded, it was lawfully taken, and as claimed, for the *use of the canal only*, and the right of ownership and possession ceased upon the abandonment and discontinuance of the canal in 1848, we are unable to see how, from the nature of the case, any contingent, reversionary right, dependent on such abandonment and discontinuance, could exist in the grantors of the petitioners. Their rights as riparian proprietors on Westfield River and Southwick Brook were not rights of property in Strap Brook or its waters, when it was lawfully taken and diverted from its water shed, but a mere right to treat a riparian owner there, or other person who unlawfully diverted it, as a tort-feasor to their riparian rights in and over their respective lands and mill-sites. A reversionary, incidental, transferable interest implies *a property* in the thing taken or granted, when taken or granted, and cannot, we think, be predicated of a mere right to treat a diversion of the flow of water as a nuisance.

If the petitioners are right in the claim that they had such a reversionary right to the restoration of Strap Brook when the canal was abandoned and discontinued, it must follow that it was the legal duty of the canal company, incident to the taking and abandonment, to restore the brook in question to its natural bed and flow, and the continued diversion thereafter constituted an injury and nuisance to the rights of every riparian owner on Southwick Brook and Westfield River, and the restoration could have been compelled by any one of them by repeated, successive actions. The claim is a novel and

far-reaching one, and if well-founded would require the canal company to restore every stream or water-course taken by them, the filling up of the canal, if demanded by the owners of land, and a general replacement of everything to ·its original condition. We are satisfied that such a duty on the part of the canal company and its successors could not have · been contemplated by the legislature who granted or the company who accepted the charter, or by the riparian . owners from whose water shed and use the brook was diverted.

Something has been said in relation to the non-payment of the assessment made to the mill-owners of Southwick Brook in 1836. In the view we take of the case, it is unimportant ·· whether that assessment was paid or not. The company took and diverted the brook, lawfully or unlawfully, and they took it in 1826. If unlawfully, the right of the mill-owners was gone at the end of fifteen years. If lawfully, the question of payment was immaterial. But, as the assessment was in favor of and against other persons than those who are parties to this proceeding, and the committee has not found either way in relation to the payment, and thirty-four years have since elapsed, that payment may well be presumed.

Such are our present impressions in respect to the rights claimed by the Agawam Canal Company and Rockwell in these cases. But as the existence of those rights has been assumed rather than shown, and the points we have considered were not fully argued, and are novel and peculiar in their character, we prefer to leave them open, and base our decision upon other grounds.

Other intricate and close questions have been raised and discussed in relation to the rights of the respondents Case and Owen to have the waters of the brook, including those of Duck Pond, flow undisturbed in their present channel to their mills. A consideration of those questions will also be · waived as unnecessary. There are other and conclusive reasons why the bill of the Agawam Canal Company and Rockwell should be dismissed.

We are all satisfied that they do not own the whole of the land on which their dam was erected.

The deed of Rockwell from Emeline Hall and her husband, conveyed an inherited interest in her to the extent owned by Townsend Edwards, but we are satisfied that he had no title east of the centre of the canal. He formerly owned, at that point, on both sides of the canal, and the adjoining proprietor on the south, Verannus Stevens, also owned on both sides of the canal. In 1845, for their mutual convenience, they exchanged lands, Townsend conveying all his land east of the canal to Verannus, and the latter conveying all his, west of the canal, to Townsend, in order that each should own upon one side of the canal only, and that that should be a boundary between them. The deed of Edwards to Stevens bounded the lot conveyed to him, as the committee finds, " west on said canal," and it is claimed, on the authority of *Bishop* v. *Seeley*, (18 Conn., 393,) that the deed carried him no farther than the top of the bank; but we think otherwise. The language of the deed in that case was "northeasterly by a line parallel with the northeasterly line of said canal, two feet therefrom." The grantor there was the owner of the entire tract and was conveying the land on which the canal was constructed, and the court held that the line intended by the deed was the outer line of the excavation. Here the grantor was conveying the land adjoining the canal by way of exchange, and for the purpose of making the canal a boundary between him and the grantee, and a different construction should be given to the deed.

The parties were exchanging lands on opposite sides of an artificial water-course, intending to make that water-course a boundary between them. The words " on the canal " do not import the line of the excavation or necessarily the water line, for the canal is neither a natural pond nor a stream. In *Bishop* v. *Seeley* the court quote from Webster's dictionary to show that the term " canal" applies to the excavation, but Webster also says that one of its meanings is " a water course," and Worcester has a similar definition. The truth seems to be that the words " on the canal" may be used to designate the line of the excavation, or the excavation to the line of the water, or the water course generally and as such,

according to circumstances. Here the parties were farmers, and were exchanging lands for mutual convenience on the opposite sides of an artificial water course, intending it to be a permanent boundary between them. In *Warner* v. *Southworth*, (6 Conn., 471,) lands were bounded on a ditch six feet wide, and the court held that, as it was intended as a boundary between the proprietors, although the grantor then owned the land on both sides, the grant should be construed to extend to the centre of the ditch. The principle of that case is applicable here. It seems impossible to look at the situation of those men, their object in exchanging lands, their intention to make the canal a boundary, the fact found by the committee that it was afterwards considered by them as a boundary, and the further fact that they subsequently agreed that the centre of the canal should be the line, and built their fences as near that line as practicable, without being satisfied that such was intended to be the effect of the deed. We are satisfied that it carried Stevens to the centre of the canal.

And it is also found by the committee that in 1851, after the waters were let out of the canal, and the waters of Strap Brook and the ponds were flowing unrestrainedly through it, and it no longer served as a protection against cattle, it was agreed between Edwards and Stevens that the centre of the canal should be the dividing line and each should erect a portion of the fence on his own side. The fences were erected accordingly. Looking to the comparatively small amount of water then flowing through the canal, it is apparent that those fences must have been erected at or near the bottom of the slope. The occupation of the parties was thereafter in accordance with that division, and the deed of Emeline Hall to Rockwell was inoperative under the statute in relation to pretended titles to the extent of such occupation, and the petitioners for that reason also are not entitled to maintain their entire dam as erected.

The right of a riparian proprietor to enter upon the land of another to abate the nuisance of diversion, exists only against the wrong-doer. None of these respondents are tort-feasors in relation to the diversion in question, and the peti-

tioners have no right to enter upon their lands, or to flow them, either in or out of the canal, for the purpose of regaining the use ot the diverted waters. If they possessed the rights they claim to possess, they should have been exercised in restoring Strap Brook to its original bed and flow. The right of Arnold Edwards and of Griffin and Stevens to the entire control of their lands, as left by the canal company when they abandoned the canal, is perfect, and their right to use the bed of the canal, and to fill it up or otherwise control it, cannot be doubted.

The petitioners cannot justify therefore the ponding of the water in the canal upon the lands of Griffin and Stevens and Arnold Edwards, or the flowage of the land of Edwards, by the erection and maintenance of their dam, and they are entitled to no assistance from the court to enable them to maintain it.

On the other hand, the right of Edwards to be relieved from the ponding and flowage of his land by the removal of the dam is perfectly clear, and for these reasons the bill of the Agawam Canal Company and Rockwell should be dismissed and the petition of Edwards should be granted, and the Superior Court is so advised.

In this opinion the other judges concurred.