[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
This is a motion for summary judgment brought by the Defendant challenging Count Five of the Plaintiff's complaint which claims title to a certain piece of property by adverse possession. The Plaintiff states that his predecessor in title enclosed with a fence, and exercised actual, open, notorious, hostile, continuous, exclusive and adverse possession under claim of right over, a tract of land which he specifically identifies by metes and bounds and which is referred to as the "North end of the Island". At issue is whether this claim is prohibited by C.G.S. Sec. 47-26[1].
The property in question has upon it what is referred to in various maps and surveys as a "canal". From an affidavit supplied by one Neil T. Wippert, we learn that this body of water, referred to as a "canal" and a "waterway" by the Defendant and Plaintiff respectively, was built around 1860 to supply power to a cotton mill. It is 1200 feet long, 30 feet wide, and ten to twelve feet deep. It drew its supply from the Quinebaug River through a series of three headgates which regulated the flow of water to the mill, and then exited over a twenty-six foot drop-off back into the river. It was never navigable and never CT Page 13293 intended for that use. It was not used for any purpose from sometime before 1960 until a hydroelectric plant was built around 1990. As noted by Mr. Wippert, "since at least 1960, there has been a chain-link fence . . . which enclosed the entire waterway, including the north end of the waterway". This north end of the waterway passes through the property sought under adverse possession. The Plaintiff owns the land abutting this piece of land to the south, including 80% of the rest of the canal/waterway and the balance of the land fenced by chain-link since at least 1960.
The Defendant claims that there is no genuine issue as to any material fact. While the Defendant, at least at this juncture and for this motion, does not contest the Plaintiff's claim that the original owner of the property was ousted of his possession and kept out uninterruptedly for a period of fifteen years by an open, visible and exclusive possession by the Plaintiff's predecessor in title without license or consent of the owner and under a claim of right it claims that such is inconsequential since the claim is barred by C.G.S. Sec. 47-26. The Plaintiff argues that the statute does not apply to this set of facts. The sole issue arising from this motion is whether this body of water is a "canal" within the meaning of C.G.S. Sec 47-26, thus barring any claim of title by adverse possession.
The term "canal" is not defined in this statute which was originally enacted in 1846. Where a term is not defined by any Connecticut statute, regulation or opinion known or cited to us, the term must be construed according to the commonly approved usage of the language. Where a statute does not define a term it is appropriate to look to the common understanding. Caldor, Inc.v. Heffernan, 183 Conn. 566 (1981). The court must look not to the meaning of the word as it may be today but what it was at the time of the enactment of the statute in order to glean the intent of the legislature.
The Defendant relies upon Bishop v. Seeley, 18 Conn. 389, (1847), a case involving a boundary dispute but not interpreting what is now Sec. 47-26. That case defined "canal" when applied to an artificial passage of water, as "a trench or excavation in the earth, for conducting water and confining it to narrow limits." In fact, the "canal" in that case was "a tidal canal — a continuation of the harbour, where the waters of the harbour ebb and flow." The case sheds no light on the intended meaning of Sec. 47-26. This case, the Defendant notes, is cited in AgawamCT Page 13294Canal Co. v. Edwards, 36 Conn. 476 (1870). Contrary to the Defendant's brief (August 20, 1998, page 5) however, the case was not cited with approval by the court as is evident from the following:
 The words "on the canal" do not import the line of the excavation or necessarily the water line, for the canal is neither a natural pond nor a stream. In Bishop v. Seeley the court quote from Webster's dictionary to show that the term "canal" applies to the excavation, but Webster also says that one of its meanings is "a water course" and Worcester has a similar definition. The truth seems to be that the words "on the canal" may be used to designate the line of the excavation, or the excavation to the line of the water, or the water course generally and as such, according to circumstances."
Agawam, supra. at page 501.
Although the issue in Agawam is one of a boundary line, it is a fascinating case which sheds much light on the issue of this case, without addressing the statute in question, because of its involvement with the then relatively new issues of the canal industry. The Defendant states on page 5 of the above cited brief that the canal was not used for transportation or irrigation purposes, but as a boundary. This is deceptive, however, because the canal was built specifically for transportation as part of the Farmington Canal Company which, as noted below, allowed boat passage from New Haven to Northampton, Massachusetts.
The Plaintiff points out that the major dictionaries of the English language, including Black's Law Dictionary, consider a canal to be an artificial ditch or trench in the earth for confining water to a defined channel to be used for purposes of transportation, navigation or irrigation. By this definition, the Plaintiff argues, the 1200 foot ditch blocked at each end does not fit the meaning of "canal" as used in Sec. 47-26.
Legislation does not usually arise in a vacuum n. It is the product of a need, real or perceived, to ensure the success of an enterprise which is intended to benefit a constituency or the public good. As one looks at the language of C.G.S. Sec. 47-26, one must ask, "What was the reason for this statute? What was it trying to achieve?" While the Defendant would argue that such questions are not necessary because the language is clear and CT Page 13295 unambiguous, this court does not agree. There is no legislative history of this statute. Neither is there any case involving adverse possession of property on a canal. There is, however, case law interpreting this statute as it relates to railroads wherein adverse possession claims were denied based solely upon the statute. While the Defendant feels that this is dispositive as to its claim for summary judgment, this court, again, does not agree. The cases which have invoked this statute all relate to a concept of transportation, albeit via railroads. One is compelled to examine why this statute was enacted in the first place using the language it did. Railroads were a relatively new method of transportation at the time this statute was enacted. The only other methods save foot or horseback were boat and wagon. Wagon, foot and horse could use public ways which were not subject to defeat by a claim of adverse possession.
Private methods of transportation were different. Rights-of-way had to be acquired and maintained for this method of transportation to be successful. The loss of a section of right-of-way through adverse possession could stop the entire operation of a railroad endeavor. Boat transport rights-of-way were in the same situation. Although this method of transportation has practically disappeared today, at the time of the enactment of this statute, it was considered to be or become an important method of passenger and freight transportation. As noted in Connecticut, by Albert E. Van Dusen (Random House, 1961) at page 320, the Saugatuck and New Milford Canal, running from Long Island Sound at Saugatuck to New Milford on the Housatonic River was incorporated in 1829, although it was never built. So also, the Ousatonic Canal running the length of the Housatonic River to the Massachusetts line was incorporated in 1822, but also never built. The Sharon Canal to connect with the Hudson or Harlem River was incorporated in 1826 but was never built. The Quinebaug Canal, intended to run from Norwich to the Massachusetts line with connections to Worcester and other towns was incorporated in 1826 but also was not built. The Enfield Canal, a by-pass around the rapids of the Connecticut River was chartered and actually built. Also, the Farmington Canal, chartered in 1822, was built and by 1835 it was open from New Haven to Northampton, Massachusetts. This canal was the subject of the litigation in Agawam Canal Co v. Edwards, supra. By 1938 passage and meals were offered on this canal from New Haven to Northampton and return. Bad weather and resulting economic problems forced the owners of this canal to consider building a railroad along the canal towpath and permission was granted to do CT Page 13296 so. While it was hoped that a railroad and canal would be operated simultaneously, that never happened and the Farmington Canal closed in 1847, the year after the enactment of the statute in question. As Professor Van Dusen notes:
 The Farmington Canal, though sound in conception, always lacked adequate capital. A depression, financial rivalries, frequent rampages of Mother Nature, and above all the advent of the railroads, sealed its doom. Even so, in its brief life it stimulated sharply the mercantile growth of New Haven.
(Connecticut supra. p 321.)
Rail and canal were linked at the time, and the success of both were certainly important to the legislature in 1847. Clearly there was a need to protect these industries from claims of adverse possession if the nation's transportation system was to grow and prosper.
The Defendant relies heavily upon the fact that a number of civil engineers who surveyed or mapped the property, referred to the body of water as a "canal". But calling something a canal in 1938 et seq. does not necessarily make it a canal within the meaning of the word in 1846. A better title on these maps or plans, had they been made at or about the time of the enactment of the statute in question, would have been "sluice", a term long out of favor in our lexicon but at one time a term which would have described perfectly the waterway here in question. "Sluice" was defined as: "An artificial passage for water, fitted with a valve or gate, as in a mill stream, for stopping or regulating the flow." Webster's New International Dictionary of the EnglishLanguage, (1909). At the time of the enactment of C.G.S. Sec.47-26, "canal" and "sluice" had very different meanings. A "canal" in the same dictionary was defined as: "An artificial channel filled with water, designed for navigation, for irrigating land, etc.; as, the Erie Canal". If the legislature intended to include a sluice in this statute in 1848, it would have done so. It probably did not because there was no need or desire to include it, while there was a need to include "canal" because of its relation to transportation. The sluice was the most common form of power for the textile mills of New England at the time of the enactment of Section 47-26. Yet "sluice" was never a term that would have been used at that time in reference to transportation. Nor would "canal" be confused with "sluice". CT Page 13297
The Plaintiff notes the juxtaposition of the words "railroad, railway or canal" in the statute as indicating that the legislature intended the term "canal" to mean a waterway for transportation. For reasons set forth by the Plaintiff and strengthened by the observations above; the court agrees. Since this court finds that C.G.S. Sec. 47-26 does not preclude the Plaintiff from claiming title to the land in question by adverse possession, the Defendant's Motion for Summary Judgment as to The Fifth Count of the Revised Complaint, dated July 7, 1998 is denied.
Mack, J.